UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Kimberly Truman,

        Plaintiff,

                                      Case No. 13-13446
v.                                    Hon. Denise Page Hood

Jackson, City of, et al.,

        Defendants.

_____/

ORDER GRANTING DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT (DOC.  # 31 AND DOC. # 32)

## I.     INTRODUCTION

Plaintiff Kimberly Truman ("Truman") is suing Defendants City of Jackson (the "City"), Jackson Housing Commission ("JHC"), Jackson Housing Commission Board of Directors ("JHC Board"), former Mayor Martin J. Griffin ("Mayor Griffin"), and JHC Board members James Starks, Gerald Montgomery, and Michelle L Pultz-Orthaus ("JHC Board Members") (collectively, "Defendants"). Truman alleges violations of her First Amendment rights, along with violations of the Michigan Whistleblower Protection Act ("WPA") and Michigan public policy.  Defendants filed Motions for Summary Judgment. The Motions for Summary Judgment are fully briefed and **GRANTED**.

## II.     BACKGROUND

Truman worked for JHC in various positions between 1987 and June 2013. On March 20, 2013, Truman became the Interim Executive Director for the JHC. On

1

February 13, 2013, prior to Truman obtaining her Interim Executive position, the United States Department of Housing and Urban Development ("HUD") placed the JHC on a "zero threshold" status for release of operating and capital program funds in HUD's Line of Credit Control System. (Doc. 32-3). The "zero threshold" status was the result of the Detroit Field Office's ("DFO") concern that the JHC failed to follow HUD's rules, regulations, and procurement policies when securing services such as payroll processing and health care coverage for its employees. *Id*. The "zero threshold" status required the JHC to submit supporting documentation that would be reviewed by HUD in order for the JHC's funding request to be available for drawdown. In addition, the JHC would have to submit all contracts to HUD for review and approval before the JHC could execute the contract. (Doc. 32-3 at 5). The DFO also noted a conflict of interest existed between the JHC and the City because the City Manager, Patrick Burtch, and City council member, Derek Dobies, were currently serving on the JHC Board. (Doc. 32-3 at 4).

On March 15, 2013, City officials and HUD representatives had a meeting. Truman did not attend this meeting, but Defendant Michelle L. Pultz-Orthaus ("Pultz-Orthaus") did, although at this point she was not yet a member of the JHC Board. After the meeting, Nakisha Paul, who worked for the DFO, allegedly informed Truman that City officials and HUD representatives had discussed the conflict of interests resulting from Burtch's and Dobies' participation on the JHC Board and other pertinent issues. (Doc. # 31-3 at 5). As noted above, Truman was named Interim Executive Director of the JHC five days later.

2

On April 19, 2013, Truman wrote a letter to HUD Secretary Shaun Donavan (the "Donavan Letter"). In the letter, Truman noted the conflict of interest that existed on the JHC Board as result of Dobies' and Burtch's positions, Mayor Griffin's violation of the "Annual Contribution Contract," and the seeming lack of solutions from the City and JHC Board to other problems. Truman voiced that citizens were concerned about their housing. She also noted that DFO officials gave directives to City officials as to what City officials could and could not do. For instance, Truman stated that officials were informed that they: (a) must hire an Executive Director soon, (b) could not restrict the JHC from seeking legal counsel, or (c) hold the JHC under any restricted terms. (Doc. # 31-7 at 3).

In May 2013, then-Mayor Griffin appointed James Stark ("Stark") and Pultz-Orthaus to the JHC Board as replacements for Dobies and Burtch.

Truman's tenure as Interim Executive Director of the JHC was brief, and it is readily apparent that Truman and the JHC Board were not working cohesively. For instance, Truman and the JHC did not agree on the JHC Board's ability to obtain legal representation. As a result of the JHC's efforts to separate healthcare services from the City, the City obtained a temporary restraining order banning the JHC from seeking its own healthcare services. (Doc. # 38-13). Truman asked the JHC Board for permission to seek legal counsel to defend against the restraining order. (Doc. # 38-12). Pultz-Orthaus informed Truman that her request violated the Open Meetings Act. (Doc. # 38-14). HUD was copied on the entire email exchange. After seeing Pultz-Orthaus' response, HUD official Nakisha Paul essentially reprimanded the JHC Board by stating:

3

> The fact that the interim ED has to make such as (sic) request is quite disturbing to me. Is there a reason that the Interim Executive Director does not have the authority to seek legal representation and guidance to defend against (sic) lawsuit. . . If the Board has denied the Housing Commission the ability to defend itself against legal action, not only is the Board working against the best interest of the Commission but each Board member is opening themselves up to legal ramifications.

(Doc. # 38-14 at 2). This is just one example of how Truman and the JHC Board did not

work together or discuss ways in which to solve problems.

Another example of the disarray resulting from the lack of communication

between Truman and the JHC Board was reflected in the events surrounding the choice of

a healthcare plan for employees. On May 15, 2013, Truman and the JHC Board had a

meeting during which Truman informed the JHC Board that it needed to approve a

healthcare plan for JHC employees or else the employees would lose healthcare coverage.

(Doc. 32-2 at 43-45). At the meeting, Truman did not provide background information

regarding the healthcare plan. *Id.* at 44; (Doc. 31-5 at 4-5). Truman's failure to provide

background information allegedly violated procurement procedures. (Doc. 32-11).

Truman admits that, at the time she presented the information to the JHC Board, she was

under the impression the JHC Board had to act quickly and approve the healthcare plan

Truman presented at the May 15, 2013 meeting or employees would lose coverage. (Doc.

32-2 at 41-42). The JHC Board approved the healthcare plan Truman presented. (Doc. 31-

5). Soon afterwards, Pultz-Orthaus conducted a cost analysis and determined that

Truman's plan was more expensive than a plan that Pultz-Orthaus proposed. (Doc. 32-

11). The Board eventually voted to switch healthcare providers because the new plan was

4

allegedly cheaper and provided coverage to former employees who lived outside the state of Michigan. (Doc. 31 at 16 - 17); (Doc. 31-6).

On June 6, 2013, the Board held a special meeting. (Doc. 38-19). The Board voted 3-1 to terminate Truman's employment. Those in favor of terminating Truman's employment were Pultz-Orthaus, Stark, and Montgomery. (Doc. 31 at 16-17).  The three Board members cited the following reasons for her termination: (1) Truman's alleged condescending attitude and disrespectful behavior (by treating the Board as if it worked for her); (2) Truman allegedly misled the Board regarding the urgency of voting on and adopting a health care plan; and (3) Truman did not provide more information regarding the healthcare plan. *Id*.

On August 12, 2013, Truman filed suit against the City, Mayor Griffin,  Pultz-Orthaus, Stark, and Montgomery, JHC, and the JHC Board. Truman alleges: (1) a violation of her First Amendment right to free speech pursuant to 42 U.S.C. § 1983; (2) a violation of the WPA, M.C.L. § 15.361 *et al*; and (3) that her wrongful termination violates Michigan public policy. Truman bases her claims on the Donavan Letter and her correspondence with HUD. (Doc. 1).

Mayor Griffin and the City filed a motion for summary judgment. (Doc. # 32). Pultz-Orthaus, Stark, and Gerald Montgomery ("Montgomery"), JHC, and the JHC Board (the "JHC Defendants") filed a separate motion for summary judgement. (Doc. # 31).

All Defendants  contend that Truman's First Amendment Claim should be dismissed because Truman did not engage in any protected speech, and she cannot

establish a prima facie case of retaliation. Furthermore, they contend there were legitimate reasons to fire Truman.

All Defendants argue that Truman's  WPA claim fails because Truman's speech was not protected under the WPA. In addition, Mayor Griffin and the City specifically argue that Truman was not a city employee and therefore she cannot sustain the WPA claim against the City. They also argue that Truman's contact with HUD did not inform HUD of anything it did not already know.

The JHC Defendants argue that Truman's WPA claim fails because she cannot sustain a prima facie case and did not report any information to a public body.

All Defendants argue that Truman's public policy claim is preempted by the WPA.

Many of the Defendants also argue they should be dismissed from the suit for various reasons. The City and Mayor Griffin argue that they had nothing to do with Truman's termination and that they are immune from suit. The JHC Board argues it is not a legal entity and naming it is redundant of naming JHC, such that the JHC Board should be dismissed.  Individual Defendants Pultz-Orthaus, Stark, and Montgomery contend that they should be dismissed because there is an absence of a genuine issue of material fact with respect to Truman's claims against them.

## III.    STANDARD OF REVIEW

A court should grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-57

6

(1986).  A fact is material if it could affect the outcome of the case based on the

governing substantive law.  *Id*. at 248.  A dispute about a material fact is genuine if on

review of the evidence, a reasonable jury could find in favor of the nonmoving party. *Id*.

The moving party bears the initial burden to demonstrate the absence of a genuine

issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant

meets this burden, the nonmoving party must "go beyond the pleadings and … designate

specific facts showing that there is a genuine issue for trial."  *Id*. at 324. The Court may

grant a motion for summary judgment if the nonmoving party who has the burden of

proof at trial fails to make a showing sufficient to establish the existence of an element

that is essential to that party's case.  See, *Muncie Power Prods., Inc. v. United Tech.*

*Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003). "The mere existence of a scintilla of

evidence in support of the plaintiff's position will be insufficient; there must be evidence

on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

"Conclusory allegations do not create a genuine issue of material fact which precludes

summary judgment." *Johari v. Big Easy Restaurants, Inc.*, 78 F. App'x 546, 548 (6th Cir.

2003).

When reviewing a summary judgment motion, the Court must view the evidence

and all inferences drawn from it in the light most favorable to the nonmoving party.

*Kochins v. Linden-Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir. 1986). The Court "need

consider only the cited materials, but it may consider other materials in the record."  Fed.

R. Civ. P. 56(c)(3). The Court's function at the summary judgment stage "is not to weigh

the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

## IV.    DISCUSSION

### A.    First Amendment Retaliation Claim

Truman argues that Defendants violated her civil rights under 42 U.S.C. § 1983 by retaliating against her in violation of her First Amendment right to free speech. She argues her termination was the result of voicing concerns regarding nepotism and government malfeasance.

The City and Mayor Griffin argue that Truman cannot sustain her claim because she was speaking as a public employee, specifically as the"Interim Executive Director" of the JHC and not as a citizen.  The JHC Defendants also contend Truman's claim fails because she was speaking in her capacity as a public employee, and that Truman addressed matters that regarded her employment rather than matters of public concern.

The Sixth Circuit has established that:

> In free-speech retaliation cases arising in the employment context, we ask three questions: Was the individual involved in "constitutionally protected" activity—here activity protected by the free speech clause of the First Amendment? *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Would the employer's conduct discourage individuals of "ordinary firmness" from continuing to do what they were doing? *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir.1998); *see  Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982). Was the employee's exercise of constitutionally protected rights "a motivating factor" behind the employer's conduct? *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. 568. The claimant must win each point to prevail.

*Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 337-

8

38 (6th Cir. 2010).[1]

## 1. "Constitutionally Protected" Activity

With respect to whether a public employee's speech constitutes "constitutionally

protected" activity, the *Evans-Marshall* court clarified:

> The first question requires some elaboration. Three Supreme Court
> cases define the contours of the free-speech rights of public employees.
>
> [1]      *The "matters of public concern" requirement.* The First
> Amendment protects the speech of employees only when it involves
> "matters of public concern." *Connick v. Myers*, 461 U.S. 138, 143, 103
> S.Ct. 1684, 75 L.Ed.2d 708 (1983). In *Connick*, . . . the Court explained that
> not all employee speech is protected, only speech that "fairly [may be]
> considered as relating to" issues "of political, social, or other concern to the
> community." *Id*. at 146, 103 S.Ct. 1684. When, by contrast, an employee's
> speech does not relate to a matter of public concern, public officials enjoy
> "wide latitude" in responding to it without "intrusive oversight by the
> judiciary in the name of the First Amendment." *Id*.
>
> [2]      *The "balancing" requirement.* If the employee establishes
> that her speech touches "matters of public concern," a balancing test
> determines whether the employee or the employer wins. *See Pickering*, 391
> U.S. at 568, 88 S.Ct. 1731. . . . In resolving the claim, the Court "balance[d]
> ... the interests of the teacher, as a citizen, in commenting on matters of
> public concern" against "the interest of the State, as an employer, in
> promoting the efficiency of the public services it performs through its
> employees." *Id*. at 568, 88 S.Ct. 1731. . . .
>
> * * * * *
>
> [3]      *The "pursuant to" requirement.* In the last case in the trilogy,
> a prosecutor reviewed a private complaint that a police officer's affidavit
> used to obtain a search warrant contained several misrepresentations.
> *Garcetti* [*v. Ceballos*], 547 U.S. [410,] 413–14 [2006]. . . . In rejecting [the

---

[1] *Evans-Marshall* was not discussed, or even mentioned, by the parties in their briefs.

9

public employee's] free-speech claim, the Court did not deny that the prosecutor's speech related to a matter of "public concern" under *Connick*, and it did not take on the lower court's reasoning that *Pickering* balancing favored the employee. It instead concluded that the First Amendment did not apply. "The controlling factor," the Court reasoned, "is that his expressions were made pursuant to his duties as a calendar deputy," making the relevant speaker the government entity, not the individual. *Id.* at 421, 126 S.Ct. 1951 (emphasis added). "We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.*

\* \* \* \* \*

A First Amendment claimant must satisfy each of these requirements: the *Connick* "matter of public concern" requirement, the *Pickering* "balancing" requirement and the *Garcetti* "pursuant to" requirement.

*Evans-Marshall*, 624 F.3d at 337-38.

"The inquiry into the protected status of speech is one of law, not fact." *Connick*, 461 U.S. at 148 n.7. *See also id.* at 150 n.10.

### a.  The *Connick* "Matter of Public Concern" Requirement

"Whether the speech at issue involves a matter of public concern is a question of law for the court[.]" *Bonnell v. Lorenzo*, 241 F.3d 800, 809-10 (6th Cir.), *cert. denied*, 534 U.S. 951 (2001). *See also Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 543 (6th Cir. 2012) (citing *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 180 (6th Cir. 2008) ("Whether or not a plaintiff's speech touches on a matter of public

concern is a question of law.").[2]  In *Connick*, the Supreme Court stated that when considering whether an expression is made as a citizen upon a matter of political, social, or other concern to the community or as an employee upon matters of personal interest, a court must determine:

> Whether an employee's speech addresses a matter of public concern . . . by the content, form, and context of a given statement, as revealed by the whole record.

*Id*. at 147-48 (footnote omitted).

In this case, it is important to identify the protected speech. Truman bases her retaliation claim on the Donavan letter and various other communications. However, the Court considers the Donavan Letter as being the only possible protected speech. Truman's other correspondence between herself and the JHC Board are communications that occurred in the course, and as a result, of her employment. For example, Truman's email to the JHC Board requesting permission to seek legal counsel is not protected. (Doc. # 38-12 at 2). Truman was not voicing any concerns to anyone, instead she was seeking permission to do something.  For these reasons, the Court will only examine Truman's First Amendment claim with respect to the Donavan letter.

In assessing whether the content of a public employee's speech constitutes a matter of public concern:

---

[2]"[T]here may be some factual questions for a jury if it is disputed whether the expression occurred or what words were specifically stated." *Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir. 2004) (citing *Waters v. Churchill*, 511 U.S. 661 (1994)).  In this case, there is no dispute that Plaintiff's expressions occurred or what words were expressed.

> The relevant analysis . . . is whether the communication touches "upon matters *only* of personal interest...." *Connick*, 461 U.S. at 147, 103 S.Ct. 1684 (emphasis added). A public concern/private interest analysis does not require that a communication be utterly bereft of private observations or even expressions of private interest. *See, e.g., Perry v. McGinnis*, 209 F.3d 597 (6th Cir. 2000) (holding that an employee was speaking on a matter of public concern even when airing a personal grievance about racial discrimination).

*Mosholder v. Barnhardt*, 679 F.3d 443, 450-51 (6th Cir. 2012). In addition, what the public employee said matters, not why he or she said it. *See, e.g., id* at 450 ("[T]he pertinent question is not *why* the employee spoke, but *what* he said...." (citing *Farhat v. Jopke*, 370 F.3d 580, 591 (6th Cir. 2004)(emphasis in original))*; Nair v. Oakland Cty. Cmty. Mental Health Auth.*, 443 F.3d 469, 479-80 (6th Cir. 2006) (same). *See also Housey v. Macomb Cnty.*, 534 Fed.App'x 316, 321 (6th Cir. 2013) ("The 'pertinent question is not *why*' he spoke, 'but what he said.' . . . And what he said reflected a subject matter that transcended the bounds of run-of-the-mill employee beef. Housey's speech thus passes the *Connick* matter-of-public-concern test.") (citation omitted) (emphasis in original)). Further, whether the speech is made public or is communicated privately within the relevant public body is not determinative. *See Perry*, 209 F.3d at 608 (a single internal grievance may constitute speech that is inherently, and is as a matter of law, a public concern); *Chappel v. Montgomery Cty. Fire Protection*, 131 F.3d 564, 579 (6th Cir. 1997) ("Constitutional protection for speech on matters of public concern is not premised on the communication of that speech to the public").

In *Perry*, the defendants argued that "if an employee is not speaking out as a

12

citizen, but is instead advancing his own personal employment dispute, that employee's complaint may not be deemed a matter of public concern." *Perry*, 209 F.3d at 608. The *Perry* court explicitly rejected that argument, stating:

> In *Chappel*, this Court plainly states that "[t]he fundamental distinction recognized in *Connick* is the distinction between matters of public concern and matters only of personal interest, not civic-minded motives and self-serving motives." *Chappel*, 131 F.3d at 575. Thus, whether Perry's racial discrimination complaint was borne of civic-minded motives or of an individual employment concern is irrelevant. . . .
>
> We find that Perry's complaint of racially disparate treatment, which consisted of an internal grievance, is a matter of public concern, and as such, we remand the issue to the district court for further consideration in line with this opinion.

*Perry*, 209 F.3d at 608-09 (emphasis added).

The speech at issue in this case (the Donavan Letter) involves Truman's complaints to HUD about tenant services to clients of the JHC and the operations and actions of the JHC (a public body), the JHC Board and, to a lesser extent, the City and City officials. The Donavan Letter indicated a conflict of interest between Mayor Griffin, the City Manager, and JHC Board Members. Through the Donavan Letter, Truman was informing HUD that there are continued violations of its rules and that no improvements have been made regarding issues that the DFO brought to the City's attention. (Doc. 31-7). Truman also informed Donavan that residents of the City of Jackson were concerned about their housing. Despite Defendants contentions, it does not matter that the information was already known to HUD. *Chappel v. Montgomery Cty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 577-78 (6th Cir. 1997) ("we reject is the suggestion that speech. . .is

13

unprotected simply because the controversy has already been defined. . . [A] a public employee's speech need not be fresh and enlightening to be considered speech on a matter of public concern."). These matters involve the public trust and government management. For these reasons, the Court concludes that the content of the Donavan Letter involved a matter of public concern.

### ii. Context and Form of Truman's Speech

The context and form of a plaintiff's speech also are relevant. As the *Bonnell* court expressly concluded following a determination that the subject (content) of the plaintiff's speech involved a matter of public concern, "[t]he context and form of Plaintiff's speech . . . require further inquiry." *Bonnell*, 241 F.3d at 813. Accordingly, the Court shall assess whether the context and form of Truman's speech support a finding that her speech was a matter of public concern.

In this case, it is undisputed that the Donavan Letter was on JHC letterhead and was sent to the Secretary of HUD. For that reason, the Court concludes that the context and form of Truman's speech also support a finding that her speech was a matter of public concern.

### iii. Conclusion

Therefore, the court concludes that Plaintiff has produced sufficient evidence to satisfy the *Connick* "matters of public concern" prong required by *Evans-Marshall*.

### b. The *Pickering* "Balancing" Requirement

As the court has determined that Truman's speech was a matter of public concern,

the court next turns to the *Pickering* "balancing" test. "At this stage, the burden is on

[Defendants] to proffer legitimate grounds for the allegedly retaliatory action at issue."

*Handy-Clay*, 695 F.3d at 544, citing *Hughes*, 542 F.3d at 180 (citing *Rodgers*, 344 F.3d at

601).

> When balancing the public employer's interest in efficient operations
> against the employee's speech interest as required by *Pickering*, the court
> considers whether "an employee's comments meaningfully interfere with
> the performance of her duties, undermine a legitimate goal or mission of the
> employer, create disharmony among co-workers, impair discipline by
> superiors, or destroy the relationship of loyalty and trust required of
> confidential employees." *Williams v. Com. of Ky.*, 24 F.3d 1526, 1536 (6th
> Cir. 1994). The balancing test focuses "on the disruption resulting from the
> speech itself, not other events." *Ibid*.

*Schroeder v. City of Vassar*, 371 F.Supp.2d 882, 893 (E.D. Mich. 2005) (Lawson, J.). *See

also Leary v. Daeschner*, 349 F.3d 888, 900 (6th Cir. 2003).

Defendants have argued that Truman's termination was the result of subsequent

behavior and actions, as discussed below. Nonetheless, there is no evidence that

Truman's "comments meaningfully interfere[d] with the performance of her duties [or]

undermine[d] a legitimate goal or mission of" the JHC. *Williams*, 24 F.3d at 1536.

Truman continued to perform her duties, and the fact that she sent the Donavan Letter

cannot be said to have undermined any legitimate goal or mission of the JHC—in fact, the

evidence indicates that two of the three JHC Board Members who voted to terminate

Truman did not even know about the Donavan Letter. In other words, there is no

evidence that Truman's speech, in itself, disrupted the operation of the JHC.

For the foregoing reasons, the Court finds that the balancing of *Pickering* interests

favors Truman.

### c. The *Garcetti* "Pursuant to" Requirement

Defendants assert that the letter to Donavan was speech made "pursuant to" her duties as an employee, not speech made as a citizen, such that Truman cannot satisfy the standard set forth in *Garcetti*. The Court agrees. Truman wrote the letter on JHC letterhead and sent the letter to Secretary Donavan in her capacity as "Interim Executive Director" of the JHC. The issues referenced therein pertained to the operations of the JHC, the activities of the JHC Board and the relationships with the City, together with how those issues had a negative effect on providing tenant services. These issues are precisely the issues which she is responsible for addressing as the Interim Executive Director of the JHC. There is no indication that she was writing the letter in her capacity as a private citizen. For these reasons, the Court concludes that Truman sent the Donavan Letter "pursuant to her official duties" as Interim Executive Director of the JHC.

### d. Conclusion

Because Truman cannot satisfy the *Garcetti* requirement, the Court holds that Plaintiff was not engaged in protected constitutional activity when she sent the Donavan Letter. Accordingly, Truman cannot prevail, as a matter of law, on her First Amendment claim and all Defendants are entitled to summary judgment on that claim.

### 2. Substantial or Motivating Factor

Even if the Court were to conclude that Truman was engaged in protected constitutional activity when sending the Donavan Letter (and assuming the balance of

interests favored Truman), the Court concludes that Truman cannot prove, as a matter of law, that her "speech was a *substantial* or *motivating* factor in the employer's decision to take the adverse employment action against the employee." *Rodgers*, 344 F.3d at 596 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). "[T]he employee must 'point to specific, nonconclusory allegations reasonably linking her speech to employer discipline." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir.2010) (quoting Rodgers, 344 F.3d at 602). The Sixth Circuit has interpreted "motivating factor" to mean the but-for cause, "without which the action being challenged simply would not have been taken." *Vereecke*, 609 F.3d at 400.

Once a plaintiff meets her burden of presenting sufficient evidence to establish a question of fact that her protected conduct was a motivating factor behind the harm, the burden of production shifts to the defendant. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). The defendant must prove by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct. *Eckerman v. Tennessee Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010). Summary judgment is appropriate if after viewing the evidence in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant.

Truman argues that the temporal proximity between her sending the letter and her termination creates a question of fact. (Doc. 39 at 23; Doc. 40 at 15). The timing between the Donavan Letter and Truman's termination is close; Truman sent the Donavan Letter to HUD on April 19, 2013, and she was fired a month and half later on June 6, 2013.

17

Temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim. *Tuttle v. Metropolitan Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir.2007). Rather, a "temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir.2006). The Court finds that the temporal proximity between the Donavan Letter and Truman's termination standing alone does not establish that the letter was the motivating factor behind the termination.[3] More significantly, the Sixth Circuit requires Truman to "point to specific, nonconclusory allegations reasonably linking her speech to employer discipline." *Vereecke*, 609 F.3d at 400. Truman argues that after she sent the letter, Defendants were angry, but Truman does not identify any documents, statements, or other events that specifically link the Donavan Letter to her termination. Truman's subjective opinions, without more, are insufficient to establish that the Donavan Letter was a motivating and substantial factor for her termination.

Even if the Court determined that Truman could "point to specific, nonconclusory allegations reasonably linking her speech to employer discipline," summary judgment would still be appropriate. Defendants demonstrated by a preponderance of the evidence that the employment decision would have been the same absent Truman's alleged

---

[3]It should be noted that two of the JHC Board members - Stark and Montgomery - who voted to terminate Truman did not know about the Donavan letter at the time they voted to fire her. (Doc # 31 at 25).

protected conduct. For instance, as justification for terminating Truman, the JHC Board notes that she was combative to work with and condescending. (Doc # 31 at 24). The JHC Board also stated that they felt misled during the process of the adopting a healthcare plan. *Id.* There is no indication that these actions were motivated by the Donavan Letter. And, as noted, two of the JHC Board members did not even know about the letter. Based on these facts, the Court cannot conclude that a reasonable jury would find a causal connection between the Donavan letter and Truman's termination. The evidence indicates that Truman's termination would have occurred in the absence of the Donavan letter.

Accordingly, the Court also concludes that Truman's First Amendment claim must be dismissed for this reason.

### B.      Whistleblowers' Protection Act Claim

Truman asserts that her termination violated the WPA. She argues that her letter reported suspected violations of the law since she was reporting "a conflict of interest existed regarding the composition of the Board of Directors for HUD and that it represented a violation of HUD regulations i.e. the Annual Contribution Agreement." (Doc. # 39 at 26).

Defendants disagree.  Mayor Griffin and the City contend that Truman was not a city employee. They also allege that Truman did not engage in any protected activity because she did not, on her own initiative, report any unknown violations of the law. In other words, Truman did not report information to HUD that it did not already know.

The JHC Defendants claim Truman cannot establish a WPA claim because she did

19

not report information to a "public body," but rather, a federal agency. According *to Leweandowski v. Nuclear Management Co, LLC*, 272 Mich. App. 120, 121 (2006), federal agencies are not considered public bodies under the WPA. Defendants also argue that Truman did not inform HUD of any violations of the law.

The WPA is designed to protect the public. *Anzaldua v. Neogen Corp.*, 292 Mich. App. 626, 631 (2011). It provides this protection by "removing barriers that may interdict employee efforts to report violations or suspected violations of the law." *Dolan v. Cont'l Airlines/Cont'l Exp.*, 454 Mich. 373, 379 (1997). The Michigan Supreme Court notes that the statute must be liberally construed in order to effectuate its purpose. *Anzaldua*, 292 Mich. App. at 631. Without providing these broad protections to employees who are willing to risk their employment by reporting suspected law violations by their employer, "the public would remain unaware of large-scale and potentially dangerous abuses." *Dolan,* 454 Mich. at 379 ; *Chandler v. Dowell Schlumberger Inc.*, 456 Mich. 395, 406 (1998). The WPA states:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

M.C.L. § 15.362.

To establish a claim under the WPA, a plaintiff must show: (1) she was engaged in protected activity;  (2) the plaintiff was discharged; and (3) a causal connection existed between the protected activity and the discharge. *Shallal v. Catholic Soc. Servs. of Wayne Cty.*, 455 Mich. 604, 610 (1997). "There are three types of protected activity: (1) reporting to a public body a violation of a law, regulation, or rule, (2) being about to report such a violation to a public body, or (3) being asked by a public body to participate in an investigation."  *Truel v. City of Dearborn*, 291 Mich. App. 125, 138 (2010).

Similar to her First Amendment Claim, Truman cannot establish a casual connection between the Donavan letter and her termination. To show causation, a plaintiff must show that "[her] participation in the protected activity led to the adverse employment action." *Robinson v. Radian, Inc*., 624 F. Supp. 2d 617, 635 (E.D. Mich. 2008) (quoting *Jones v. City of Allen Park*, 167 Fed.Appx. 398, 406 (6th Cir.2006) (citing *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (noting the question in retaliation cases is whether the employer would have reached the same decision even if the plaintiff had not engaged in protected conduct). Additionally, a plaintiff must show "something more than a temporal connection between protected conduct and an adverse employment action." *Cooney v. Bob Evans Farms, Inc.*, 645 F. Supp. 2d 620, 631 (E.D. Mich. 2009), aff'd, 395 F. App'x 176 (6th Cir. 2010).

As proof of causation, Truman does not identify anything  more than a temporal proximity between sending the letter and her firing. Again, Truman fails to produce any evidence, documents, or statements that create a genuine issue of material fact regarding

21

whether her termination was connected to the Donavan letter.

Truman notes that Mayor Griffin appointed Pultz-Orthaus to the JHC Board, and prior to her appointment to the JHC Board,  Pultz-Orthaus attended a meeting between HUD and City of Jackson officials. (Doc. # 40 at 27).  She also notes how Pultz-Orthaus, along with two others, was appointed to the Board. According to Truman, this demonstrates the dual capacity that Pultz-Orthaus served by presumably being a member of the Board and a city official. However, it is unclear how Pultz-Orthaus' attendance at this meeting, and her subsequent appointment links Truman's termination to the Donavan letter. Pultz-Orthaus and two members who did not even know about the letter voted to terminate her. Accordingly, Truman failed to demonstrate that the Donavan letter led to her termination. Consequently, Truman's WPA claim is dismissed.

### C.    Michigan Public Policy Claim

Truman alleges that her termination violated Michigan public policy. Defendants contend that this claim must be dismissed because it is preempted by the WPA. "[A] public policy claim is sustainable ... only where there also is not an applicable statutory prohibition against discharge in retaliation for the conduct at issue. . . Where a statute prohibits the conduct at issue, 'Michigan courts have consistently denied a public policy claim.'" *Briggs v. Univ. of Detroit-Mercy*, 22 F. Supp. 3d 798, 807 (E.D. Mich. 2014) aff'd, 611 F. App'x 865 (6th Cir. 2015)(citations omitted).

The WPA protects employees against retaliation who report, or plan to report, suspected violations of laws, rules, or regulations to a public body. M.C. L. § 15.362.

22

Truman alleges Defendants retaliated against her by terminating her employment after she informed HUD officials of Defendants' alleged misconduct. (Doc. # 1 ).  This is the exact conduct that the WPA protects. Truman cannot sustain a public policy claim alleging retaliation for the identical reasons she alleges a violation of the WPA.  Summary judgment is appropriate regarding this claim. *See also*, *Anzaldua v. Neogen Corp.*, 292 Mich. App. 626, 631 (2011) (the WPA "preempts common-law public-policy claims arising from the same activity.").

## V.      CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that

1.      The Motion for Summary Judgment filed by Defendants City of Jackson and Martin J. Griffin (Doc.# 32) is **GRANTED**; and

2.      The Motion for Summary Judgment filed by Defendants Jackson Housing Commission, Jackson Housing Commission Board of Directors, Michelle Pultz-Orthaus, James Stark, and Gerald Montgomery (Doc. # 31) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's cause of action is **DISMISSED.**

**S/Denise Page Hood**
**Denise Page Hood**
**Chief Judge, United States District Court**

**Dated:  September 30, 2016**

23

**I hereby certify that a copy of the foregoing document was served upon counsel of record on September 30, 2016, by electronic and/or ordinary mail.**

**S/LaShawn R. Saulsberry**
**Case Manager**